I'll move to appeal 22-2833 Christopher Roalson v. Jon Noble and Ms. Byers we'll begin with oral argument from you your honors counsel and may it please the court my name is Claire Myers and I represent the petitioner Christopher Rolson. Mr. Rolson's sixth amendment confrontation clause rights were violated when the state introduced the testimony of Ryan Gajewski the original DNA analyst through the testimony of a substitute analyst Carly Leder. Leder testified as to the procedures Gajewski followed the observations he made and the professional judgment he exercised in creating his certified formalized report. Clearly established Supreme Court law prohibits the admission of such testimony and the Wisconsin State Court's decision was contrary to this precedent when it held otherwise. Ms. Myers are there certain questions that you think counsel would have posed to Gajewski that could not be asked of the subsequent expert lighter? Yes your honor. What would those be? Of course the record in this case actually provides an excellent example of the questions that could have been asked if Gajewski had taken the stand. So on pages 301 to 304 of the separate appendix Leder testified as to the processing of the barstool which was one of the weapons that the state used to pin Rolson and not Davis to the crime. She testified as to that she testified that the barstool was first screened for bloodstains that an analyst can determine whether to swab multiple areas of an item and that was done in this case that different stains were selected for a DNA analysis and she also testified that Gajewski who had done the processing in that in for that item had opted to use YSTR DNA analysis rather than autosomal DNA analysis. So if we can compare that to Leder's testimony, Leder's testimony about an item that she did process, a pair of rubber gloves, she provided very similar testimony. She was able to describe how that item was swabbed and whether any blood was detected. During cross-examination and this starts at page 308 of the separate appendix, Leder was asked about her testing of the rubber gloves since she had actually performed that analysis and she was asked what detected or not. Then defense counsel tried to ask her about the processing of the barstool and she responded that she would have to review the report because she was not the one who had processed it. It's exactly that kind of question that Melendez-Diaz guarantees that a defendant should be able to ask. He had the ability to ask and the answer may well have helped the defendant. I guess how do we distinguish this case? In criminal cases, for instance, very frequently agents will testify based upon another agent's report. The chemist comes to mind, the DEA chemist. If a defendant challenges the weight or the makeup of a particular drug, a chemist who may have left the DEA's employment years ago or may not be available to testify on that day, the government just gets another chemist who testifies that I reviewed the report. Here are the steps that that chemist took. They were the same steps that I would have took and I adopt the report and the findings of the report as my own even though I wasn't the one to perform the particular test. And then that is what's subject to cross-examination. Why is that not enough here in the DNA context as well? Thank you, Your Honor. So, Bullcoming prohibits the kind of testimony that describes an analyst, the procedures that an original analyst follows when those procedures reveal the analyst's independent judgment. In Melendez-Diaz, the court described that the testing in that case, which I believe was a gas chromatograph, involved several steps. It was a specialized process. But hold on for a minute. I think the difference here, the difference that I'm trying to capture is when an agent cannot testify, an expert cannot testify, that that's someone else's opinion, right? That's what I think it was, Bolingbroke is the name of the case, or Bullcoming says you can't adopt, you can't testify that that's someone else's opinion. But our cases hold you can adopt the opinion as your own and testify that I reviewed the reports, I reviewed the manner in which the testing was done, and this is my expert opinion. And now I am subject to cross-examination. Isn't that what happened here? Your Honor, the court's decision in Bullcoming is a bit different. It did not hinge on whether or not the substitute analyst introduced the conclusions of the original analyst, but rather on the fact that what the substitute analyst or what the surrogate witness was introducing was the human interpretation contained in the testimonial statements of the report. I agree with you, it doesn't, that isn't a problem for you. So in this case, Your Honor, we really are drawing the distinction between raw data, which is not covered by the confrontation clause, in which an expert may rely on to reach independent conclusions, and the kind of human analysis that Gajewski performed in this case, that Leder did not simply rely on, but also testified to in this case. But Ms. Meyer, is that, that seems like a very difficult line to draw, right? Because when you're looking at raw data, raw chemical data, someone, right, is not very often that you can just put a glove into a chromatograph and have something come up, right? Someone, besides the sampling, when that sample is given to a lab, someone at the lab, right, is diluting the sample, it's processing the sample, making sure that the slides are properly made, choosing which slides to How would you, it seems like that line between raw data and anything that, you know, would require human interaction, that that line doesn't seem like a very meaningful one, because even processing raw data, there's human interaction and trying to make sure that the tests are done correctly. Thank you, Your Honor. So while that line might be difficult to draw in an EDGE case, this case falls very squarely on the side of the line of human analysis. So in this case, Leder testified as to certain discretionary decisions that Gajewski made, and the Defense Council was not able to cross-examine those discretionary decisions. There's also observations contained in the report that only Gajewski could be cross-examined about, not Leder. For instance, on certain pieces of evidence that there were, you know, that there was enough DNA to take samples of certain pieces of evidence and not enough to take samples of others. So while discretion might be implicated in other, you know, forensic analysis that was done, I think the distinction here would be not only was this human analysis performed and Leder testified as to it, not merely relied on it to form her independent judgments. If I could ask you a question about the clearly established federal law, I mean, as you undoubtedly know, the Supreme Court just granted cert in Smith v. Arizona, which kind of addresses what I would think is a very relevant question here, right? Whether the Confrontation Clause permits the prosecution in a criminal trial to present testimony by a substitute expert conveying the testimonial statements of a non-testifying forensic analysis, right, on the grounds that the testifying expert is offering some independent opinion and the analyst statements are offered not for their truth but to explain the expert's opinion and the defendant independently seek to subpoena the analyst. Isn't that really the question we're dealing with here? And if the Supreme Court thinks it's so unsettled that it has to grant cert in this case, what's the basis of the argument that it was clearly established that the defendant here had a right to confront the underlying original expert? Of course. So in Smith, the petitioner asked the court to address two questions that Williams expressly left open, and that's whether, well, the first question is whether facts underlying an expert witness's opinion, what sometimes is called basis evidence, is offered for its truth, and the second question is whether the Confrontation Clause is satisfied when the defendant has the opportunity to call the original analyst. So neither of those questions is implicated in this case. This case is squarely decided by Bollcoming, which is not at issue or at, you know, at risk of being overturned by Smith, and that's that distinction between this raw machine-generated data and the human analysis that was contained in Gajewski's report, and to which leader testified. Thank You, Ms. Byers. We will be giving you some rebuttal time. Thank you. Thank you. We'll now move Ms. Burgundy to you for argument on behalf of the state. Thank you. May it please the court, my name is Sarah Burgundy. I'm an assistant attorney general from Wisconsin, and I'm representing John Noble. I just want to clarify, leader testified to her own opinions and conclusions that she based on Ryan Gajewski's data and notes. To the extent that Rolson is arguing that she entered his report through her testimony is incorrect. The report was never admitted into evidence. She never referenced the report. It happened that her conclusions agreed with the report, but that was to be expected as this already went through a peer review and was produced in a report by Gajewski. There is really no clearly established US Supreme Court law holding that the Confrontation Clause prohibits what happened here. We have a qualified DNA expert analyst. She did a technical review of data and notes produced by another analyst. She reached her own opinions and conclusions. She testified to those opinions and conclusions, and she never referenced the original report and was fully cross-examined by the defendant. And because we are in habeas and subject to AEDPA, that's the start and the end of this case. There's no clearly established law holding to Rolson's position, and in fact, if his position is correct, there's effectively no way to admit DNA evidence if an Ms. Burgundy, we have kind of an interesting chain of case law here. You've got the Luther Williams case from Wisconsin. Then you've got the US Supreme Court case, Williams v. Illinois. Then you've got Deadwiller, and Deadwiller is interpreting the US Supreme Court case, which is a fractured opinion attempting to discern where Wisconsin's law on Confrontation Clause follows after the Supreme Court case. What if we were to find Deadwiller to be less than fully accurate? If we were to read that opinion as not accurately reflecting what the US Supreme Court did in Williams v. Illinois, how would that affect the analysis? You would still have to look to the United States Supreme Court law to say, okay, well, the Court of Appeals got it wrong, or Deadwiller is wrong, it's wrong for them to rely on it, but we still have to look at Williams, Bull Cumming, Melendez-Diaz to see if the Supreme Court is clearly established that what happened here is a violation of the Confrontation Clause. I think as a matter of rule of thumb, I think if you're trying to rely on Williams from the US Supreme Court as clearly established law, it's difficult. I mean, even in the multiple opinions in that case, the justices noted that they were not clearly establishing the law. And as Judge Lee mentioned, the Supreme Court's currently deciding the issue now, which I think underscores that it's not clearly established. And to the extent that you might think Wisconsin got it wrong and Deadwiller or any of the disagreements in these cases have come to why the Confrontation Clause does not bar this evidence, not whether it violates the Confrontation Clause. And that's displayed in Williams in the main opinion. There was a question of whether it was offered for the truth. Justice Thomas said it's not testimonial. There's also a question of whether it's a primary purpose. So there's a lot of different ways to get there, but ultimately the Supreme Court has never said that this can't come in. I wanted to just touch on the harmless error argument, which you absolutely do not have to reach because there's no clearly established law. But I think it's helpful to point out that Rolson relies pretty heavily on the state's opening and closing arguments to the extent they mentioned the DNA. But if you look at Rolson's closing argument and how heavily that council talked about DNA there, there are a number of evidence that actually supported his position that Davis, his co-actor, was the murderer and not him. Whereas the state's case was really primarily based on the two witness statements from Davis and from Walzak that were eerily similar. Both talked about how Davis and Rolson went to a house before going to the victim's house and that the motion light came on and they moved on and went to the second house. And then Rolson's comments that he made about God not being there while he was stabbing Roszak. And other evidence all established that Rolson was in the house. Really the only question was who stabbed the victim. So unless the court has further questions, I'm willing to rest on the Ms. Myers will turn back to you for rebuttal and will grant you two minutes of rebuttal time. Your honors, I just wanted to address one point in rebuttal and that's the question of harmless error. In order for this court to hold that the error that the state court's error was harmless, it must be convinced that the error was and as Jensen B. Clements tells us, the standard is not whether the state could have proved its case otherwise. The standard is whether the evidence that was erroneously admitted had a substantial and injurious influence on the jury's verdict. And here, the record reflects that it did. Pardon me. The DNA evidence provided a crucial link between Mr. Rolson and the knives and barstool evidence that was supported otherwise only by the testimony of Austin Davis, who had every reason to point the finger at Mr Rolson and a witness who, although she claimed to be a good friend of Mr Rolson's, was not present at the scene. And it is well documented that DNA evidence is powerful to juries. Under these circumstances, the state court's error could not have been harmless. Well, thank you, Miss Myers. And we want to thank you and Mr Scadro and on your firm for taking the case and for your excellent advocacy. Thank you as well, Miss Burgundy, for your excellent advocacy. The case will be taken revised. Thank you. Very good. Thank you. We will